UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICKY SHINABARGER,

    Plaintiff  
v.  

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

Civil Action No. 13-11744
HON. JUDITH A. LEVY
U.S. District Judge
HON. R. STEVEN WHALEN
U.S. Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff, Ricky Shinabarger ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's motion for summary judgment be GRANTED and that Plaintiff's motion be DENIED.

## PROCEDURAL HISTORY

On November 27, 2009, Plaintiff filed applications for Disability Insurance Benefits ("DIB") (Tr. 137-140) and Supplemental Security Income ("SSI") (141-144) alleging disability as of September 20, 2005 (Tr. 137). After the initial denial of the claim, Plaintiff

requested an administrative hearing, held on August 23, 2011 in Flint, Michigan before Administrative Law Judge ("ALJ") Peter N. Dowd (Tr. 40). Plaintiff, represented by attorney Mikel Lupisella, testified, as did Vocational Expert ("VE") Stephanie Lorey (Tr. 45-69, 70-75). On December 6, 2011, ALJ Dowd found that Plaintiff was not disabled (Tr. 35). On February 20, 2013, the Appeals Council denied review (Tr. 1-6). Plaintiff filed for judicial review of the final decision on April 18, 2013.

## BACKGROUND FACTS

Plaintiff, born May 18, 1962, was 49 when the ALJ issued the decision (Tr. 35, 137). He completed two years of college (Tr. 159) and worked previously as a mechanic and truck driver (Tr. 154). He alleges disability due to depression, bipolar disorder, and Post Traumatic Stress Disorder ("PTSD") (Tr. 153).

### A.     Plaintiff's Testimony

*The ALJ prefaced the testimony by noting that he would be ordering a pulmonary function test and a mental status evaluation to be conducted subsequent to the hearing* (Tr. 44).

Plaintiff currently lived with his sister and her son in Swartz Creek, Michigan (Tr. 45-46). He moved to his sister's home after completing a two-year prison stint (Tr. 46). He completed a two-year trade school program in 1981 (Tr. 47). He was divorced in 2003 (Tr. 48).

Plaintiff worked for a muffler company driving a semi-truck starting in 1996 (Tr. 48).

He also worked as a mechanic for two other companies around the same time (Tr. 49). Between 1997 and 2005, he worked exclusively as a mechanic (Tr. 50). He engaged in substance abuse after his 2003 divorce, but was able to continue working until 2005 when he began "hearing voices and having nightmares" (Tr. 50). He was charged with cocaine possession in 2004, 2005, and 2006 and plead guilty in May, 2007 to an offense leading to a prison term (Tr. 51). He was currently on parole (Tr. 52-53). He had not looked for a job since being released from prison due to "mental problems" (Tr. 53).

Plaintiff stood 5' 10" and weighed 247 pounds (Tr. 53-54). He no longer used alcohol but continued to smoke despite experiencing Chronic Obstructive Pulmonary Disorder ("COPD") (Tr. 54). In March, 2010, he was hospitalized for five days due to COPD (Tr. 55). He currently received Medicaid, state-sponsored disability benefits, and food stamps (Tr. 55). Due to COPD he was unable to walk even 100 feet without becoming winded, but the condition did not create problems standing (Tr. 56). He also had "acute arthritis in both hips" (Tr. 56). He could stand for up to 20 minutes (Tr. 57). His driver's license was suspended in 2007 because he owed $56,000 in back child support payments (Tr. 57).

He first experienced depression in 2004 after his divorce and the death of his parents (Tr. 58). He started hearing voices around the time he began using cocaine but continued to hear voices when ceasing drug use (Tr. 58). The "voices" urged him to hurt himself but not others (Tr. 58-59). He had not hurt himself in response to the voices (Tr. 58). He attended Narcotic Anonymous meetings "periodically" (Tr. 59). He completed the 12-step program

during his incarceration and currently saw a mental health therapist every three to four weeks and a physician for a medication review every three months (Tr. 59-60). In addition to psychotropic and COPD medication, he took prescribed medication for hand and leg shaking (Tr. 61). In addition to the above-discussed conditions, he required the use of a C-PAP machine for sleep apnea (Tr. 62) and also experienced social anxiety (Tr. 61).

On a typical day, he arose between 9:30 and 10:00 and retired at 10:00 p.m. (Tr. 63). He was able to take care of his personal needs and on an occasional basis, clean and prepare meals for his family (Tr. 63). He had an email address, but used the computer rarely (Tr. 63-64). He was able to perform yard work and shop for groceries (Tr. 64). He spent most of his day watching television (Tr. 65). He did not experience problems interacting with his family or neighbors (Tr. 67). He was unable to resume his job as a mechanic due to mental and respiratory problems (Tr. 68).

In response to questioning by his attorney, Plaintiff stated that he required a two-hour nap every day due to the medication side effect of fatigue (Tr. 69). He reported that nightmares caused sleep disturbances (Tr. 69). He also alleged concentrational problems (Tr. 69).

  B.  **Medical Evidence**

    **1. Treating Sources**

September, 2009 records by New Passages Mobile Crisis Center state that Plaintiff sought psychotropic medications due to his inability to procure medication because of court-

imposed travel restrictions (Tr. 206-208).  He appeared well groomed but anxious with a normal thought process (Tr. 210).  He denied a history of "psychosis or thought disorder" (Tr. 211).  His social skills and social relationships were deemed "strengths" (Tr. 212).  He stated that he wanted to "get all his ducks in a row" before starting work full time (Tr. 212).  He was assigned a GAF of 45[1]   (Tr. 213, 215).  The following month, therapy records note a history a crack cocaine use (Tr. 246).  His chances of recidivism were deemed "medium" (Tr. 247).  He was assigned a GAF of 49 (Tr. 249).

The same month, Catholic Charities performed an evaluation of Plaintiff's mental condition, assigning him a GAF of 40[2] (Tr. 323).  Treating records from November, 2009 indicate a GAF of 45 (Tr. 312).   The same month, records by Catholic Charities state that Plaintiff was receiving Trazadone and Invega (Tr. 327).  Treatment records state "no hallucinations" or "thought disorders" (Tr. 288).

In April, 2010, Plaintiff was referred for emergency treatment after experiencing breathing difficulties (Tr. 230).  May, 2010 records note a diagnosis of COPD and pneumonia (Tr. 225).  In June, 2010, chest and sleep consultant Joseph Varghese, M.D.

---

[1]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR*" )(4th ed. 2000).

[2]A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM-IV* at 34.

examined Plaintiff, noting reports of "chest tightness and wheezing" (Tr. 334). Plaintiff admitted to smoking a pack of cigarettes each day (Tr. 334). Dr. Varghese noted that imaging studies showed the presence of COPD with "significant improvement" with the use of bronchodilators (Tr. 335). Treating notes from the following month state that the COPD was attributable to smoking (Tr. 336).

October, 2010 treating records state that Plaintiff was assigned a GAF of 50, accompanied by a remark that he was out of psychotropic medication (Tr. 355). December, 2010 medication review records by Spencer Ballard, D.O. state that that Plaintiff reported a "pretty good" mood (Tr. 350). Dr. Ballard assigned Plaintiff a GAF of 60[3] (Tr. 351, 413).

In January, 2011, Frazer Wadenstorer, M.D., recommended weight loss and the use of a BiPAP machine to combat symptoms of sleep apnea (Tr. 380). In April, 2011, Dr. Spencer completed a state disability assessment, stating that Plaintiff had a current GAF of 50 (Tr. 359), depression, and suicidal thoughts (Tr. 358), but no hallucinations (Tr. 359). Dr. Spencer found marked limitations in understanding and remembering detailed instructions, working within a schedule, making simple decisions, completing a workday without psychologically based interruption, and acting appropriately with the general public (Tr. 361-362). Treating notes from the following month note diagnoses of anxiety, major depression,

---

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

and PTSD (Tr. 370).

In June, 2011, Dr. Varghese, remarking that Plaintiff had dramatically reduced his tobacco usage, again noted diagnoses of COPD and obesity (Tr. 363). Dr. Varghese remarked that Plaintiff's condition was significantly improved with the use of an inhaler (Tr. 363-364). The same month, Dr. Ballard assigned Plaintiff a GAF of 65[4] (Tr. 415-417). August, 2011 medical treating records note a diagnosis of bipolar disorder (Tr. 367). Plaintiff was prescribed Naproxen for hip pain (Tr. 367).

## 2. Consultive and Non-Examining Sources

In March, 2010, Karen Marshall, Psy.D. performed a consultative psychological evaluation on behalf of the SSA, noting Plaintiff's report of experiencing drug abuse and depression after his divorce and the loss of his parents (Tr. 251). He reported good relationships with his sister and nephew, noting that he had been homeless before the May, 2007 incarceration (Tr. 252). Dr. Marshall noted that Plaintiff was anxious but cooperative (Tr. 252). He appeared depressed (Tr. 252). Dr. Marshall concluded that Plaintiff could "understand, remember and complete simple and repetitive tasks in a supportive environment" (Tr. 253). She noted that although he could understand "multi-step tasks," concentrational problems would require "redirection" and "positive reinforcement" (Tr. 253). She assigned him a GAF of 50, noting that he had a "fair" prognosis provided that he

---

[4]GAF scores in the range of 61–70 suggest "some mild symptoms or some difficulty in social, occupational, or school functioning." *DSM–IV–TR* at 34.

continue therapy (Tr. 254).

The same month, a non-examining Psychiatric Review Technique by Leonard C. Balunas, Ph.D. found the presence of affective disorders (Tr. 256, 259) with mild deficiencies in activities of daily living, and moderate limitations in social functioning, and concentration, persistence, or pace under the "'B' Criteria" (Tr. 266). He found Plaintiff's allegations of psychosis only "partially credible," citing September, 2009 records indicating the absence of psychosis (Tr. 268). Dr. Balunas also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff experienced moderate limitation in the ability to understand, remember, and carry out detailed instructions; maintain attention for extended periods; and interact appropriately with the general public (Tr. 270-271). Dr. Balunas concluded that Plaintiff was capable of understanding, remembering, and carrying out simple instructions, interacting appropriately with coworkers, and dealing with most workplace changes (Tr. 272).

In October, 2011, Nancy L. Koenig-Forbis, Ph.D. performed a mental status examination on behalf of the SSA, noting Plaintiff's reports of depression after the death of his parents and niece and his divorce (Tr. 388). He reported that he heard voices during this time telling him to harm himself (Tr. 388). He reported social isolation, adding that breathing problems were brought on by the memory of his personal failures (Tr. 388). He stated that he had received a diagnosis of paranoid schizophrenia (Tr. 389). He reported suicidal ideation but no immediate plans (Tr. 390). Dr. Koenig-Forbis assigned Plaintiff a

GAF of "45/50" with the "intellectual ability to follow simple and complex instructions" (Tr. 394). She found moderate difficulties interacting appropriately with the public and coworkers (Tr. 401).

The same month, a consultative physical examiner, Scott Lazzara, M.D., found that Plaintiff was able to perform a wide range of exertional, postural, and manipulative functions without difficulty (Tr. 413). Dr. Lazzara found that Plaintiff could lift or carry up to 50 pounds occasionally and 25 frequently; sit for eight hours in an eight-hour workday; and stand or walk for six (Tr. 438-439). Dr. Lazzara found that Plaintiff was capable of unlimited manipulative activities except for a limitation on reaching to frequent (as opposed to *constant*) (Tr. 440). He found Plaintiff capable of all postural activity on an occasional basis (Tr. 441). As to environmental limitations, Plaintiff was limited to occasional moving of mechanical parts, operating a motor vehicle, exposure to humidity and wetness, and vibrations, as well as a preclusion on working with temperature extremes (Tr. 442). Dr. Lazzara noted that an x-ray of the bilateral hips was unremarkable (Tr. 445).

### 3. Material Submitted After the December 6, 2011 Administrative Opinion

On December 9, 2011, Dr. Varghese noted that Plaintiff's condition was "essentially unchanged" from previous examinations (Tr. 452). The same month, treating notes by Dr. Ballard state that Plaintiff had no thoughts of self harm but reported fragmented sleep (Tr. 471-472). Dr. Ballard assigned Plaintiff a GAF of 65 (Tr. 473).

### C. Vocational Expert Testimony

VE Stephanie Lorey classified Plaintiff's former work as a mechanic as skilled at the medium level of exertion and truck driver, semiskilled/medium[5] (Tr. 71). She testified that her findings were consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 70). The ALJ then posed the following hypothetical question to the VE, taking into account Plaintiff's age, education, and work history:

> [A]ssume an individual . . . [who] could maximally lift weights of 20 pounds, could repetitive light weights of 10 pounds or less . . . could stand and walk intermittently in an eight-hour work day for a total of four of eight hours, could sit at least six of eight hours in an eight-hour work day, and that the individual would need to occasionally have the option to sit or stand, and that the individual could only occasionally climb stiars, balance items while standing and walking, stoop, kneel, crouch, and crawl, that the individual would need to avoid concentrated exposure in a potential work setting to fumes, odors, dust, and gases, and avoid exposure to hazards such as unprotected heights or moving industrial machinery. And that from a mental standpoint, the individual could do only simple routine and repetitive work activities in a stable work environment indicative of maximum abilities to do unskilled work . . . and could tolerate superficial contacts with supervisors and coworkers in a potential work setting, but could not work with the general public in a potential work setting. Could such an individual perform [Plaintiff's] past work? (Tr. 71-72).

The VE stated that the above limitations would preclude the individual from performing Plaintiff's past relevant work and most exertionally light work but would allow

---

[5]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

for the sendentary/unskilled work of a sorter (3,700 positions in the lower peninsula of the State of Michigan); final assembler (11,800); and packer (4,800) (Tr. 73).

In response to questioning by Plaintiff's attorney, the VE stated that if the same individual missed more than two days of work each month, required longer than customary work breaks, was off-task at least 20 percent of the time due to concentrational problems, was unable to work within a schedule, or, was unable to stay on task at least 20 percent of the work day due to psychologically based symptoms, all gainful employment would be precluded (Tr. 73-74).

**D. The ALJ's Decision**

Citing Plaintiff's medical records, the ALJ found that Plaintiff experienced the severe impairments of obesity, "COPD/emphysema/asthmatic bronchitis," degenerative disease of the right hip and knees, major depressive disorder, anxiety, and "history of cocaine dependency" but that none of the conditions met or medically equaled an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 24-28). He found that Plaintiff experienced moderate deficiencies in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 28). The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for a "very limited range of light exertional work" with the following limitations:

> [C]laimant . . . must occasionally have the option to sit or stand. The claimant can only occasionally climb stairs, balance, items while standing or walking, stoop, kneel, crouch, and crawl. The claimant must avoid exposure to fumes, odors, dust, gases. The claimant must avoid exposure to hazards such as

unprotected heights and moving industrial machinery. The claimant can only mentally perform simple, routine, and repetitive tasks in a stable work environment, i.e., unskilled work. The claimant can mentally tolerate only superficial contact with coworkers and supervisors, but can have no contact with the general public (Tr. 29-30).

Citing the VE's testimony, the ALJ noted that the above restrictions eliminated most exertionally light positions but allowed for the performance of the sedentary work of a sorter, assembler, and packer (Tr. 34).

The ALJ discounted a portion of the alleged limitations, citing Dr. Balunas' conclusion that Plaintiff was capable of performing "simple one-two step tasks on a routine and regular basis" (Tr. 31). As to the physical limitations, the ALJ gave "significant weight" to Dr. Lazzara's opinion that Plaintiff was capable of "at least" exertionally light work (Tr. 31). The ALJ noted that despite the professed limitations as a result of a hip condition diagnosed in 1986, Plaintiff was able to perform exertionally medium work until 2005 (Tr. 31). Notwithstanding limited treatment by Dr. Ballard, the ALJ found that he was a "treating source," but declined to accord the assessment controlling weight because it was unaccompanied by an "articulation" of the rationale for the findings (Tr. 32).

### **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she

can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### Plaintiff Has Not Established That a Remand Is Warranted

Plaintiff argues that the hypothetical question to the VE did not account for his full degree of impairment. *Plaintiff's Brief* at 6-16, *Docket #8*. He contends, in effect, that the omission of critical psychological and physical limitations from the hypothetical question invalidates the Step Five finding that he was capable of a significant range of work. *Id.* at 6 (citing *Felisky v. Bowen,* 35 F.3d 1027 (6th Cir. 1994)).

Plaintiff does not identify any specific deficiencies in the hypothetical question. Instead, he argues that critical omissions in the hypothetical question stem from the ALJ's erroneous credibility determination. He points out that his testimony that he experienced audio hallucinations and was unable to walk more than 100 feet, (Tr. 50-51, 56), is supported by the diagnoses of COPD and major depression. *Plaintiff's Brief* at 10-11.

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms. "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically

acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186 at *2. The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."*Id.* [6]

The ALJ's credibility determination and by extension, the choice of hypothetical limitation, is well supported and explained. He acknowledged the diagnoses of COPD and knee and hip problems by limiting Plaintiff to a narrow range of light work with significant postural limitations (Tr. 29). To the extent that the severe impairments of anxiety and depression created some degree of psychological restriction, the ALJ restricted Plaintiff to "simple, routine, repetitive tasks in a stable environment" with only "superficial contact with coworkers and supervisors" and a preclusion on work with the public (Tr. 72).

The ALJ supported the exclusion of more stringent limitations from the hypothetical

---

[6]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

question by citing Dr. Lazzara's October, 2011 finding that Plaintiff was capable of lifting 20 pounds frequently and walking for a total of up to six hours in an eight-hour work day (Tr. 31). The ALJ noted that the longstanding diagnosis of hip arthritis did not prevent Plaintiff from working until 2005 when he ceased work due to cocaine addiction (Tr. 31). The ALJ cited Dr. Koenig-Forbis' October, 2011 mental status examination report that Plaintiff experienced moderate limitations in interacting with coworkers and the public but could carry out complex instructions (Tr. 32). Plaintiff's claim of ongoing hallucinations is contradicted by treating records showing that he denied hallucinations for the relevant period (Tr. 210, 288, 359). I note further that the ALJ's choice of psychological limitations, including a preclusion on all contact with the public and unskilled work, exceeds the level of impairment found by Dr. Koenig-Forbis (Tr. 72). Because the ALJ's credibility determination was supported by substantial evidence, he did not err in excluding all of the professed claims from the hypothetical limitations. See *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118-119 (6th Cir.1994)(ALJ not obliged to include properly discredited allegations of limitation in hypothetical to VE).

Plaintiff's brief also contains a recitation of the "treating source rule," but is unaccompanied by any citation to a treating source opinion, much less a fact-based explanation of how the ALJ erred in the analysis of the treating records. Plaintiff does not dispute or even cite the ALJ's rejection of Dr. Ballard's finding of a number of marked psychological limitations (Tr. 32, 361-362). My own review of the transcript shows that the

ALJ's discussion and conclusions regarding Dr. Ballard's opinion were well articulated and supported by substantial evidence. The ALJ stated that he adopted Dr. Ballard's finding that Plaintiff could perform unskilled activities, but noted that the treating psychiatrist's evaluation did not provide a rational for the conclusions, in contrast to Dr. Koenig-Forbis' well explained findings (Tr. 32). Moreover, I note that Dr. Ballard's treating records showing a "pretty good mood," (Tr. 350) and GAFs of 60 to 65 (Tr. 351, 413, 415-417) undermine his conclusion that Plaintiff experienced multiple marked psychological limitations (Tr. 361-362).

Finally, although Plaintiff has not cited the medical evidence he submitted after the ALJ's decision, I have considered this evidence in making my recommendation (Tr. 452-481). To establish grounds for remand based on such material, the claimant must show that the "new evidence is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); see *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir.1993). First, Plaintiff has not provided "good cause" for the tardy submission of the newer material. Moreover, as noting by the Appeals Council order, a portion of the evidence pertains to Plaintiff's condition subsequent to the administrative decision and as such, is intrinsically irrelevant to whether he was disabled on or before that date (Tr. 2). See *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 712 (6th Cir.1988)(records related to a claimant's condition *after* the administrative decision not "material" to the ALJ's findings). If Plaintiff believes that he can establish disability after

the date of the decision, his remedy would be to apply for benefits for the later period.[7] *Id.* Because Plaintiff has not shown that the newer records would be likely to alter the ALJ's decision, a remand on this basis is not warranted.

In closing, I note that my recommendation to uphold the Commission's decision should not be read to trivialize Plaintiff's physical and mental conditions. Still, the ALJ's determination that he was capable of performing a significant range of work was comfortably within the "zone of choice" accorded to the fact-finder at the administrative hearing level. As such, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

### CONCLUSION

For the reasons stated above, I recommend that Defendant's motion for summary judgment be GRANTED and that Plaintiff's motion be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with

---

[7]The newer records suggest, if anything, that his mental condition improved after the date of the decision.

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: May 30, 2014

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on May 30, 2014, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen
